## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cr-00116-TWP-MJD |
| | ) | |
| RUSSELL CHARLES TAYLOR, | ) | |
| | ) | |
| Defendant. | ) | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW ON
### DEFENDANT'S MOTION TO SUPPRESS

This matter is again before the Court on Defendant Russell Taylor's ("Taylor") Motion to Suppress and Request for *Franks* Hearing (the "Motion") ([Filing No. 62](#)).  On February 26, 2024, upon remand from the Seventh Circuit Court of Appeals, the Court held an evidentiary hearing on Taylor's Motion. The Government appeared by Kathryn E. Olivier and Bradley Paul Shepard, Assistant United States Attorneys.  Taylor appeared in person, in custody, and by counsel, Zachary Lee Newland and Jeremy Brian Gordon.  Federal Bureau of Investigation ("FBI") Special Agent Andrew Willmann attended as agent for the Government.  David Moxley was the Court Reporter. In this Entry, the Court **denies** Taylor's Motion and states its findings of fact and conclusions of law.

### I.     FINDINGS OF FACT

#### A.     Procedural Background

In 2015, Taylor was indicted on twelve counts of producing child pornography and one count of possession of child pornography.  *United States v. Taylor*, No. 1:15-cr-165 (Dkt. 22). Taylor pled guilty to all counts and was sentenced.  *Taylor*, No. 1:15-cr-165 (Dkt. 46).  In 2020, the Court granted in part Taylor's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct

Sentence, and vacated his guilty plea and sentence. *Taylor*, No. 1:15-cr-165 (Dkt. 63). On May 27, 2020 a federal grand jury indicted Taylor on twenty-four counts of sexual exploitation of a minor and attempted sexual exploitation of a minor; four counts of coercion and enticement; three counts of distribution of visual depictions of a minor engaging in sexually explicit conduct; one count of receipt of visual depictions of minors engaging in sexually explicit conduct; one count of possession of visual depictions of minors engaging in sexually explicit conduct; and one count of conspiracy to possess visual depictions of minors engaging in sexually explicit conduct ([Filing No. 1](#)).

On April 30, 2021, Taylor filed the instant Motion, seeking to suppress evidence obtained from the search of his residence on April 29, 2015 and for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). Taylor challenged the validity of the warrant (the "Search Warrant") authorizing the search of his residence and the supporting affidavit (the "Affidavit"). The Affidavit requested authorization to search for evidence of both child pornography and bestiality. The typed Search Warrant mentioned only child pornography. Handwritten alterations to the Search Warrant added "bestiality" to its scope. Taylor argued that the search is invalid because the Affidavit's affiant, Indiana State Police ("ISP") Sergeant Kevin Getz ("Sergeant Getz"), made material misrepresentations and omissions, and because the handwritten alterations were not considered by the Indiana judge who signed the Search Warrant, the Honorable Travis Sandifur ("Judge Sandifur") ([Filing No. 62 at 1](#)–2).

On June 14, 2021, the Court denied Taylor's request for a *Franks* hearing and his Motion to Suppress ([Filing No. 67](#)). Taylor entered into a conditional plea agreement and was sentenced to a term of 324 months' imprisonment ([Filing No. 69](#); [Filing No. 92](#)). On May 20, 2022, Taylor filed his notice of appeal ([Filing No. 94](#)).

On March 24, 2023, the Seventh Circuit vacated the Court's judgment and remanded this case for an evidentiary hearing. *United States v. Taylor*, 63 F.4th 637 (2023). The Seventh Circuit's decision was divided into two parts. In Part A, the Seventh Circuit addressed "whether probable cause would exist to search for evidence of either child pornography or bestiality if the affidavit's alleged infirmities were corrected." *Id.* at 648. The court concluded that probable cause existed to search for evidence of bestiality but not child pornography. *Id.* at 648–49. In Part B, the court considered whether the Search Warrant "fulfilled the Fourth Amendment's promise that all probable-cause determinations be made by a neutral magistrate." *Id.* at 649. The court found that "[g]iven the unexplained handwritten alterations, the record does not show that it did. Because probable cause existed only for bestiality and because there is no evidence that the issuing judge approved the handwritten alterations authorizing a search for evidence of bestiality, an evidentiary hearing is needed." *Id.* The Seventh Circuit concluded with the following directive:

> An evidentiary hearing is needed to determine whether the issuing judge approved the alterations to the warrant prior to its execution. Questions surrounding those alterations will be relevant to the *Leon* good-faith exception to the exclusionary rule, so that hearing must also encompass false statements and material omissions in the underlying affidavit and law enforcement's subjective good faith in seeking the search warrant. Whether the evidence at that hearing can cure the search warrant's constitutional problems is a question for the district court to address after finding the necessary material facts.

*Id.* at 661.

On February 26, 2024, the Court held an evidentiary hearing. The Court heard testimony from Judge Sandifur, Sergeant Getz, and two of Taylor's minor victims, and received evidence.[1] After the hearing, the parties filed their proposed findings of fact and conclusions of law (Filing No. 133; Filing No. 134).

---

[1] Exhibits 1, 8, and 9 were admitted over Taylor's objections (Filing No. 131 at 9:9–11, 89:7–10). Exhibits 2, 2-A, 3, 5, 5-A, 6, and 16 were admitted without objection. *Id.* at 54:21–22, 74:16–17, 98:9–10, 86:25–87:1, 174:24–25, 157:15–16. Because the Government did not file these exhibits on the docket, the Court will cite them as "Ex. _."

**B.**     **Factual Findings**

    **1.**     **The Investigation**

The investigation of Taylor began when ISP Captain Chuck Cohen contacted Sergeant Getz (who was a detective at the time) and told him that Master Trooper Etter ("Trooper Etter") was going to call him about a potential child pornography case (Filing No. 131 at 57:17–58:2). Sergeant Getz did not know Trooper Etter before this investigation. *Id.* at 57:22–58:2, 58:22–59:4. Sergeant Getz has been employed by the ISP since around 1993. *Id.* at 26:1–8. He was a road trooper from 1993 to 2005 or 2006, when he became a general assignment detective in the Bloomington, Indiana, district. *Id.* at 26:1–6. In November 2013, Sergeant Getz became a detective with the ISP Internet Crimes Against Children ("ICAC") unit. *Id.* at 25:17–23. Sergeant Getz received no training related to his promotion as detective with the ICAC unit, except a one week long session in Florida. *Id.* at 115:4–7. Most of Sergeant Getz's career was spent working in southern Indiana. *Id.* at 26:9–14. Sergeant Getz was the lead investigator in the investigation of Taylor. *Id.* at 26:15–18. This investigation was only the third ICAC case on which Sergeant Getz was the lead investigator, and it was Sergeant Getz's first case in Marion County, Indiana. *Id.* at 26:9–14, 28:10–14.

Trooper Etter called Sergeant Getz, and the men spoke for approximately five minutes. *Id.* at 60:17–20. Trooper Etter reported that he had a female friend named Melissa Hamilton ("Hamilton") who had received concerning text messages, and he gave Sergeant Getz Hamilton's telephone number. *Id.* at 59:7–10. Sergeant Getz did not ask for any background information about Hamilton because he was planning to interview her and determine the validity and credibility of her concerns himself. *Id.* at 59:13–18. For these same reasons, Sergeant Getz did not ask Trooper Etter about his relationship to Hamilton, including how long he had known her, how they

met, or whether he thought she was credible.  Sergeant Getz and Trooper Etter did not have any other contact during the investigation into Taylor.  *Id.* at 60:6–20.

Sergeant Getz then called Hamilton and scheduled an in-person interview for October 3, 2014, at her home.  *Id.* at 61:1–15.  Sergeant Getz thought he would need to extract data from Hamilton's cell phone, so he brought Sergeant Chris Cecil ("Sergeant Cecil"), an ISP forensic examiner trained in such extractions.  *Id.* at 61:20–24, 125:10–13.  When Sergeants Getz and Cecil arrived at Hamilton's home, retired Indianapolis Metropolitan Police Department ("IMPD") Officer Ron Santa ("Santa") was also there.  *Id.* at 62:7–12.  Sergeant Getz spoke to Santa for about ten minutes. Before this discussion, Sergeant Getz did not know Santa or know he was a retired IMPD officer. *Id.* at 62:13–21. Santa offered vague information about Taylor and alleged that Taylor was the subject of a drug investigation.  *Id.* at 62:22–63:16.  Sergeant Getz did not find Santa's information to be credible, so he contacted ISP's drug enforcement unit to ask about the alleged drug investigation.  ISP's drug enforcement unit stated they were not investigating Taylor. *Id.* at 63:8–64:1.  Neither Santa nor Hamilton provided any details about their relationship. Sergeant Getz was not interested in information about their relationship, and he did not believe Santa had any relevance to his investigation.  *Id.* at 64:10–21, 121:8–11, 170:2–4.  Santa was not present for Hamilton's interview.  *Id.* at 129:24–130:4.

During her interview, Hamilton stated she was with Trooper Etter when she received the text messages from Taylor.[2]  *Id.* at 65:20–66:7.  Sergeant Gets did not ask Hamilton about her relationship with Trooper Etter because his primary concern at the time was obtaining the text messages from her cell phone.  *Id.* at 65:3–12, 65:20–66:7.  Hamilton told Sergeant Getz she used

---

[2] The text messages are restated in the Affidavit and evidentiary hearing transcript, and they are summarized in the Seventh Circuit's mandate. (Ex. 1 at 15–18, ¶ 28; Filing No. 131 at 33:12–39:23); *Taylor*, 63 F.4th at 644–46.  Because the substance of those messages is not material to the Court's conclusions, they will not be restated here.

to work at a strip club in Indianapolis, Indiana, which was where she and her late husband met Taylor. *Id.* at 67:10–68:5. Sergeant Getz noted that Hamilton was forthcoming in talking about her work at a strip club and in providing details and photographs of her sexual activity. *Id.* at 68:6–18. Sergeant Getz thought Hamilton's willingness to reveal embarrassing or compromising information lent credibility to her allegations about Taylor. *Id.* at 68:19–22.

Hamilton informed Sergeant Getz of the following: she reconnected with Taylor in 2014 and began a sexual relationship with him, his then-wife Angela Taylor ("Angela"), and two of their friends. *Id.* at 68:23–69:20, 167:22–169:2. In May 2014, she began receiving concerning text messages from Taylor that made references to bestiality. *Id.* at 70:2–11. Hamilton believed Taylor and Angela were serious when discussing engaging in bestiality because she had received multiple bestiality-themed messages from them and because she had engaged in "swinger" activities with them. *Id.* at 70:12–19.

Hamilton showed Sergeant Getz an image that Taylor had texted her, which showed a female engaging in bestiality with a dog, as well as the text message "Here's Angie with her ex's dog." *Id.* at 70:20–71:7. At the time, Hamilton did not explain why she believed the woman in the image was Angela. *Id.* at 71:12–22, 75:10–13. Hamilton also showed Sergeant Getz the text message she had received from Taylor offering to send images of "dogs, orgy, young girls, et cetera," and a text message referring to Thailand. The references to young girls and Thailand concerned Sergeant Getz because, based on his training and experience, Thailand is known for underage sex trafficking. *Id.* at 78:10–79:2. Hamilton told Sergeant Getz that Taylor had a computer and a smart phone, and that she had been to Taylor's residence, where two minor children were living. *Id.* at 79:8–18. Sergeant Getz was concerned that if Taylor was involved in child

pornography, then he might be committing contact sex offenses against the minor children.  *Id.* at 79:18–23.

At the end of the interview, Hamilton let Sergeant Cecil take her cell phone to complete a forensic extraction.  Sergeant Getz returned her cell phone the next day.  *Id.* at 80:21–24.  Sergeant Getz found Hamilton to be credible in part because her statements on October 3, 2014 were corroborated by the text messages from Taylor.  *Id.* at 79:24–80:3; (Ex. 1 at 15–18, ¶ 28).  In reviewing the forensic extraction, Sergeant Getz focused solely on text messages between Hamilton, Taylor, and Angela, since those were the messages about which Hamilton had expressed concern (Filing No. 131 at 81:10–23).  Sergeant Getz did not review the text messages between Hamilton and Trooper Etter or Santa because they were not part of his investigation.  *Id.* at 81:24– 82:4, 169:3–170:4.

Sergeant Getz conducted a second interview of Hamilton on November 3, 2014, after the Marion County Prosecutor's Office requested a more specific identification of the woman in the bestiality image.  *Id.* at 71:23–72:12, 115:14–23.  During the second interview, Hamilton identified the woman in the image as Angela, stating "I know for sure it was her."  *Id.* at 75:10-76:13, 116:3- 6; (Ex. 2 at 1–2; Ex. 2-A at 1-2).  She based her identification, in part, on the large areolas and white lingerie in the image (Filing No. 131 at 75:10–76:13, 116:3–6; Ex. 2 at 1–2; Ex. 2-A at 1– 2).  Hamilton explained that she had seen Angela's exposed breasts on more than ten occasions and that Angela predominantly wore white lingerie.  Hamilton identified herself and Angela in an explicit photograph to provide context and support for her identification (Filing No. 131 at 77:3– 23; Ex. 2 at 2–3; Ex. 2-A at 2–3).

Sergeant Getz did not write a supplemental report regarding the November 2014 interview because he intended to document Hamilton's identification of Angela in the Affidavit (Filing No.

131 at 72:12–16; 104:22–105:5).  Sergeant Getz was not attempting to hide Hamilton's November 2014 statements.  *Id.* at 105:9–11.  Sergeant Getz's failure to write a supplemental report violated ISP policy.  As of the date of the evidentiary hearing, Sergeant Getz was the subject of a disciplinary investigation related to his failure to make the supplemental report.  *Id.* at 153:1–11.

During his investigation, Sergeant Getz determined that the phone number for "Russ Taylor" in Hamilton's cell phone was associated with "Russell Taylor."  *Id.* at 82:7–14.  Sergeant Getz also confirmed Taylor's home address (the "Residence"), and that Taylor and Angela received mail at that Residence.  *Id.* at 82:15–24.  He conducted physical surveillance of the Residence on three occasions.  During his surveillance, Sergeant Getz noted the description of the Residence, took photographs of the exterior of the Residence, and recorded the license plate number of any vehicle in the driveway.  *Id.* at 82:25–83:8.

Sergeant Getz first surveilled the Residence on October 17, 2014.  *Id.* at 102:3–9; (Ex. 1 at 18, ¶ 30).  That day, he observed a gray Nissan and two other vehicles matching descriptions of vehicles registered to Angela in the driveway, and he noted the license plate numbers for those vehicles (Filing No. 131 at 84:15–21).  Then, on April 21, 2015, he saw a grey Hyundai Sonata and an orange vehicle in the driveway.  *Id.* at 85:5–13; 86:21–87:1; (Ex. 5).  Sergeant Getz noted the license plate numbers for those vehicles and determined that the Hyundai Sonata was registered to Angela and that the orange vehicle was registered to Taylor (Filing No. 131 at 85:14–25; 89:16–90:8; Ex. 5; Ex. 8; Ex. 9).

In January 2015, at the request of a Marion County prosecutor, Sergeant Getz applied for precision location data, known as a "ping," on Taylor's cell phone (Filing No. 131 at 90:25–91:2, 91:22–92:1).  Sergeant Getz had not previously applied for a "ping," and he has applied for only two other "pings" since.  *Id.* at 92:2–9.  In 2024, if Sergeant Getz were asked to obtain a "ping,"

he would provide the cell phone number to the ISP's Electronic Surveillance Unit. *Id.* at 92:10–17. The Electronic Surveillance Unit would complete the "ping" paperwork; collect, analyze, and retain the data; and forward a summary of the data to Sergeant Getz. *Id.* at 92:23–93:10. However, in January 2015, Sergeant Getz did not even know the Electronic Surveillance Unit existed, so he completed the "ping" paperwork himself and received the data directly from AT&T, Taylor's cellular provider. *Id.* at 93:11–94:1.

The data that AT&T emailed Sergeant Getz identified the latitude and longitude of Taylor's cell phone every fifteen minutes, twenty-four hours a day. *Id.* at 93:22–94:1. Sergeant Getz received these emails for seven days before terminating his request. In total, he received hundreds of emails. *Id.* at 94:2–4. Sergeant Getz plotted the latitude and longitude coordinates using Google Earth, which revealed that the coordinates were in the area of the Residence. *Id.* at 94:5–8. The AT&T data also showed that the "financially liable party" for the cell phone was the "Jared Foundation Inc.," which had a different "credit address" than Taylor's address (the "Jared Foundation Address"). *Id.* at 98:24–99:12; (Ex. 3). The "billing party" for the cell phone was the "Jared Foundation Inc.," and the listed user was "Jared Fogel," both listed at the Jared Foundation Address (Filing No. 131 at 98:15–24; Ex. 3). The "contact home email address" for the cell phone was Russell.Taylor@yahoo.com. (Filing No. 131 at 100:14–19; Ex. 3). Sergeant Getz did not retain all of the emails from AT&T because the data consistently corresponded to the area of the Residence, though he recognizes that he should have retained all of the emails (Filing No. 131 at 94:12–21).

### 2.      **The Affidavit**

After obtaining the "ping" information, Sergeant Getz believed he had enough evidence to apply for a search warrant, so he returned to the Marion County Prosecutor's Office. *Id.* at 94:22–95:9). Based in part on the "ping" data, the Marion County Prosecutor's Office authorized Sergeant

Getz to request the search warrant for the Residence. *Id.* at 94:22–95:9. Prior to this investigation, Sergeant Getz had applied for five to seven residential search warrants as an ICAC detective, none of which were in Marion County. *Id.* at 27:16–28:2. He did not apply for many residential search warrants as a general assignment detective because the cases for his team were "divvied out" to various detectives. *Id.* at 27:21–25.

Sergeant Getz created the Search Warrant and Affidavit using a template provided by another investigator. *Id.* at 28:3–9. The template contained language for child pornography. *Id.* at 28:23–29:2, 123:16–19. Sergeant Getz added all references to bestiality and all of the facts relevant to establishing probable cause to search for evidence of bestiality. *Id.* at 32:22–33:3, 34:24–35:1, 36:2–11; (Ex. 1 at 3–5, 14–18, ¶¶ 2–3, 5–6, 23–25, 28–29). Sergeant Getz added references to bestiality in multiple places because, at that stage of the investigation, he considered bestiality to be the lead crime under investigation and believed that "the bulk of the evidence was leading" toward a bestiality investigation (Filing No. 131 at 29:6–31:8, 40:8–10). This case was the only bestiality case Sergeant Getz had investigated in his career with ISP. *Id.* at 125:20–25. The Affidavit also contained language regarding the search and seizure of cell phones. *Id.* at 29:19–22, 31:9–32:2; (Ex. 1 at 5–7, ¶¶ 9–13).

The Affidavit contains numerous typographical errors due to Sergeant Getz's poor proofreading (Filing No. 131 at 32:3–10; *e.g.*, Ex. 1 at 6 (containing three paragraph 12s)). More troublingly, the Affidavit contained numerous misstatements and omissions. Paragraph 21 of the Affidavit states: "Master Trooper Etter stated he had been approached by a female friend, Jane Doe [Hamilton]," about text messages she had received from Taylor (Filing No. 131 at 95:11–17; Ex. 1 at 13–14, ¶ 21). Though an oversight, Sergeant Getz omitted the fact that Trooper Etter was with Hamilton when she received the text messages (Filing No. 131 at 96:1–15; 113:2–8). The Affidavit

10

also inaccurately described Hamilton as a "female friend" because Sergeant Getz had not asked Trooper Etter or Hamilton about their relationship.  At the time Sergeant Getz drafted the Affidavit, he believed Trooper Etter and Hamilton were friends.  *Id.* at 95:21–25, 96:16–24.  Had Sergeant Getz known about their romantic relationship, he would have included that fact in his affidavit.  *Id.* at 66:18–67:5, 96:20–97:2.  Additionally, Sergeant Getz referred to Hamilton as "Jane Doe" because he believed it was an innocuous way to protect Hamilton's identity, since she had expressed concern about Taylor learning that she had reported him to law enforcement.  *Id.* at 80:4–18. Hamilton was a confidential witness and not a confidential informant.  *Id.* at 171:1–5.  The ISP has additional vetting and documentation requirements for confidential informants, as well as additional disclosure obligations in probable cause affidavits.  *Id.* at 171:8–172:4.

In the Affidavit, Sergeant Getz quoted some of the text messages extracted from Hamilton's cell phone.  *Id.* at 33:20–22; (Ex. 1 at 14–18, ¶¶ 24, 28).  Sergeant Getz identified the names associated with the text messages, "Russ Taylor" and "Angela-Russ," as "Russell Taylor" and "Angela Taylor," respectively (Filing No. 131 at 33:23–34:1, 34:2–6, 34:20–23, 35:10–17; Ex. 1 at 15–18, ¶ 28).  Embedded in the text messages were two hyperlinks containing language that led Sergeant Getz to suspect they pertained to bestiality (Filing No. 131 at 36:23–37:5, Ex. 1 at 15–18, ¶ 28).  One hyperlink was to "beastythumbs.com" with the phrase "horse-blowjob," and the other hyperlink was to "beastiegals.com." (Filing No. 131 at 36:23–37:5; Ex. 1 at 7–9, ¶ 16).  Sergeant Getz accessed both hyperlinks and determined that both websites were dedicated to bestiality (Filing No. 131 at 36:2–22).

In paragraph 28 of the Affidavit, Sergeant Getz recited text messages from Taylor that allude to bestiality.  *Id.* at 38:25–39:2, (Ex. 1 at 15–18, ¶ 28).  Sergeant Getz stated that during the October 2014 interview, Hamilton showed Sergeant Getz an image from Taylor that showed a

11

female engaging in bestiality with a dog (Filing No. 131 at 38:8–14).  Sergeant Getz stated that Hamilton had identified the woman in the image as Angela, though he did not mention that Hamilton had identified Angela during a second interview, that Hamilton had seen Angela's breasts on more than ten prior occasions, or that Hamilton knew that Angela mostly wore white lingerie. *Id.* at 103:24–104:8.  Sergeant Getz also described the text from Hamilton to Taylor requesting "pics I can masturbate over," and Taylor's response, "Yes. What type? Her with dogs, orgy, S&M, young girls, et cetera." *Id.* at 39:3–7, 39:16–23; (Ex. 1 at 15–18, ¶ 28).  Based on his investigation, Sergeant Getz believed that the reference to "Her" was a reference to Angela (Filing No. 131 at 39:24–40:3).

In paragraph 30, Sergeant Getz described his surveillance of the Residence on October 17, 2014, when he saw two vehicles registered to Angela in the driveway. *Id.* at 102:3–9; (Ex. 1 at 18, ¶ 30).  The Affidavit does not describe his surveillance on April 21, 2015,[3] when he saw a vehicle registered to Taylor at the Residence.  (Filing No. 131 at 102:16–23; Ex. 5; Ex. 9.)

In paragraph 32, Sergeant Getz characterized Taylor's cell phone as "a cell phone number assigned to the Jared Foundation Inc.," stated the cell phone number was "assigned to the Jared Foundation Inc.," and stated that "Russell Taylor serves as executive director of the Jared Foundation." (Filing No. 131 at 98:24–99:5; Ex. 1 at 18–19, ¶ 32).  Sergeant Getz did not include the fact that the Jared Foundation was the "financially liable party"; that the "credit address" was the Jared Foundation Address; that the listed user was "Jared Fogel," or that the contact email was Russell.Taylor@yahoo.com.  *Id.* at 99:13–17, 100:6–22.  Sergeant Getz recognizes that he should have included this information in his Affidavit.  *Id.* at 101:2–6.  The omissions were an oversight

---

[3] During the evidentiary hearing, the Government asked Sergeant Getz whether he omitted his "surveillance reports from April 13th." *Id.* at 102:16–17. It appears that the Government meant to refer to April 21, 2014. Earlier in the hearing, Sergeant Getz stated that his surveillance notes from April 13 did not relate to Taylor. *Id.* at 175:7–21.

by Sergeant Getz, caused by his lack of experience drafting probable cause affidavits. *Id.* at 99:16–17; 100:10–11, 100:23–101:1, 175:25–176:5.

Also in paragraph 32, Sergeant Getz referred to "mobile locator results," meaning the "ping" data for Taylor's cell phone. *Id.* at 101:12–15. All of the "ping" data geolocated to the Residence. Sergeant Getz never saw Taylor's cell phone in the area of the Jared Foundation Address. *Id.* at 101:19–21. If Sergeant Getz had seen Taylor's cell phone in that area, then he would have included that fact in his Affidavit. *Id.* at 101:22–24.

In Attachment B to the Affidavit, Sergeant Getz requested to seize, among other things, "information that reflects a sexual interest in animals or an interest in or access to websites containing bestiality in any form, wherever it may be stored or found," "cell phones," and "production images of bestiality with subjects identified as Russell C. Taylor and/or Angela M. Taylor." *Id.* at 40:13–41:11; (Ex. 1 at 22–23, attach. B at §§ a–c).

### 3. The Search Warrant

In April 2015, Marion County, Indiana, search warrant submissions were submitted and sworn out in person (Filing No. 131 at 42:11–13). To submit and swear out the Search Warrant, Sergeant Getz went to the Arrestee Processing Center ("APC") in Marion County, since that was where he understood an on-call judge would be. *Id.* at 41:12–42:10. He brought a hard copy of the Search Warrant and Affidavit with him. *Id.* at 42:11–13. Sergeant Getz was not familiar with the APC and was led there by an IMPD detective. *Id.* When Sergeant Getz arrived at the APC, he would have been given a cause number for the Search Warrant and then shown into the judge's office and sworn in. *Id.* at 10:6–10:19. Sergeant Getz gave his hard copies of the Affidavit and Search Warrant to Judge Sandifur to review. *Id.* at 42:14–43:2. Judge Sandifur recalls reviewing the Affidavit and Search Warrant in this case. *Id.* at 9:17–19, 17:24–18:6; (Ex. 1 at 29).

In April 2015, Judge Sandifur was a commissioner at the APC (Filing No. 131 at 7:4–10). In that capacity, he reviewed applications for search warrants and, if he found probable cause, issued the warrants. *Id.* at 7:11–14. It was important to Judge Sandifur to be thorough when reviewing search warrant submissions because he did not want to issue warrants not supported by probable cause. *Id.* at 11:23–12:6. Judge Sandifur has rejected hundreds or thousands of search warrants over the course of his career for lack of probable cause. *Id.* at 12:7–13. If an officer failed to establish probable cause in an affidavit, Judge Sandifur would point that out to that officer. *Id.* at 11:8–19. If he saw an inconsistency between an affidavit and a search warrant, he would also point that out to the officer. *Id.* If any changes needed to be made to a search warrant submission, Judge Sandifur's practice was to permit officers to make handwritten changes, and have the officers initial those changes and resubmit the documents for review. *Id.* at 10:20–25, 16:19–17:4. Judge Sandifur would have told officers, including Sergeant Getz, "[i]f there is something that you want, that is not contained within the order, you need to put it on that order." *Id.* at 22:19–23:2, 23;23–25. Judge Sandifur would not initial any handwritten changes because he viewed the warrant application "as [the officers'] submission as a unified document . . . so it would be their changes to make," not Judge Sandifur's. *Id.* at 11:1–11:7, 16:15–18.

When Judge Sandifur reviewed Sergeant Getz's submission, he noticed a discrepancy between the Affidavit and Search Warrant. *Id.* at 43:6–10. Specifically, he noticed that bestiality was mentioned multiple times in the Affidavit and Attachment B, but evidence of bestiality was not included in the Search Warrant. *Id.* at 23:15–19. Judge Sandifur also noticed that cell phones were mentioned in the Affidavit and Attachment B but not in the Search Warrant. *Id.* at 23:20–22. These discrepancies were due to Sergeant Getz's oversight; although Sergeant Getz had made

changes to the template affidavit in preparing his submission, he failed to make the same changes to the template warrant. *Id.* at 43:17–44:4.

Consistent with his general practice, Judge Sandifur told Sergeant Getz that if he wanted bestiality to be included in the Search Warrant, then he needed to add it, and he sent Sergeant Getz to make the changes. *Id.* at 23. At the evidentiary hearing, Sergeant Getz at first did not recall what Judge Sandifur told him could be done about the discrepancies between the Affidavit and Search Warrant, but he later recalled that Judge Sandifur told him he could make handwritten alterations. *Id.* at 43:7–14, 44:7:12, 177:2–11. Sergeant Getz made the handwritten changes on page 28 of the Search Warrant packet to correct his inadvertent omissions and to make the Affidavit consistent with the Search Warrant. *Id.* at 44:17–45:11; (Ex. 1 at 28). Sergeant Getz made the handwritten notations on page 29 for the same reasons (Filing No. 131 at 13:5–15, 45:12–17; Ex. 1 at 29). Sergeant Getz initialed all of these changes except one on the bottom of page 29, which he failed to initial through inadvertence (Filing No. 131 at 45:18–22).

Sergeant Getz made the handwritten changes on pages 28 and 29 before Judge Sandifur considered and signed the Search Warrant. *Id.* at 13:5–14, 44:5–16, 45:6–8, 163:19–21. Judge Sandifur considered all of the handwritten changes before he issued the Search Warrant. *Id.* at 13:5–14; 45:23–46:6, 21:21–22:2. Sergeant Getz did not alter the Search Warrant after it was issued by Judge Sandifur. *Id.* at 49:2–10.

Judge Sandifur issued the Search Warrant because he believed that the Affidavit established probable cause to search for evidence of bestiality and child pornography. *Id.* at 13:15–19, 19:21–20:4. Judge Sandifur would have reached the same conclusion even if the Affidavit had disclosed that Hamilton was romantically involved with Trooper Etter because the text messages from

Taylor, the hyperlinks to bestiality-dedicated websites, and the descriptions of the image of bestiality spoke for themselves. *Id.* at 13:20–14:3.

On April 29, 2015, law enforcement executed a search of the Residence pursuant to the Search Warrant. During the search, investigators found child pornography on electronic devices found in the Residence, but they did not find any evidence of bestiality. On advice of an IMPD detective, Sergeant Getz applied for a second search warrant to make child pornography, rather than bestiality, the primary charge under investigation. *Id.* at 50;10–24, 51:9–17. Sergeant Getz was the affiant on the second search warrant (Ex. 6). Sergeant Getz swore out the second warrant in front of a different APC commissioner, not Judge Sandifur ([Filing No. 131 at 51](#):20–23, 53:24–54:6; Ex. 6 at 1–2, 22, 31). Sergeant Getz did not return the first Search Warrant until September 4, 2015, because he was focusing his time on the ongoing investigation of Taylor ([Filing No. 131 at 47](#):12–14; 147:14–24). Sergeant Getz acknowledges that five months is not a typical length of time to wait to file a return and that the delay was an error on his part. *Id.* at 147:10–17.

### 4.   <u>Continued Investigation</u>

In or about June 2015, one of Taylor's minor victims ("Minor Victim 1") was forensically interviewed at a child advocacy center. *Id.* at 106:4–7, 179:21–180:1. She was eight or nine years old. *Id.* 180:15–17. During the interview, Minor Victim 1 did not disclose that she was molested at the Residence. *Id.* at 180:18–25. Minor Victim 1 had told Angela about the molestation when it occurred, and Angela offered to tell Minor Victim 1's father what happened. *Id.* at 183:7–24. Minor Victim 1 believed that Angela had told her father about the molestation until approximately August or September 2015, when Minor Victim 1 realized no one knew about the molestation. At that point, Minor Victim 1 told a counselor about it. *Id.* 181:1–5; 183–184:10.

As a result of her disclosure, Minor Victim 1 was forensically interviewed a second time in September 2015. *Id.* at 105:22–106:3, 181:6–10. Sergeant Getz attended the September 2015

interview.  During that second interview, Minor Victim 1 disclosed that she was the victim of a contact offense committed by Taylor at his Residence.  *Id.* at 106:10–16, 108:14–18, 181:11–15.  If Judge Sandifur had declined to issue the Search Warrant on April 23, 2015, then Sergeant Getz would have added Minor Victim 1's disclosure in September 2015 to the Affidavit and reapplied for a search warrant.  *Id.* at 110:6–11.

Sergeant Getz did not write a supplemental report regarding Minor Victim 1's September 2015 disclosure because by then, Taylor had been charged federally and was cooperating in the investigation.  It was Sergeant Getz's understanding that all of the allegations against Taylor would be resolved through federal prosecution.  *Id.* at 106:12–13, 108:19–109:5.  Sergeant Getz also did not tell federal agents or prosecutors about Minor Victim 1's September 2015 disclosure.  *Id.* at 109:6–16.  Instead, Sergeant Getz put a copy of the recorded interview into his working file and forgot about it until the summer of 2023.  *Id.* at 109:18–22, 157:21–158:1, 160:15–23.  When Sergeant Getz re-discovered the recording in 2023, he provided his entire file to the FBI agents assigned to the case.  *Id.* at 109:23–110:2.

If the Search Warrant had not been issued in April 2015, Sergeant Getz would also have added the disclosure of another one of Taylor's minor victims ("Minor Victim 2").  In 2015, when she was fifteen years old, Minor Victim 2 learned that she was a victim of Taylor.  *Id.* at 185:16–25.  Minor Victim 2 was interviewed by an investigator in 2015 and recalled being frightened and feeling like she was "going to get in trouble."  *Id.* at 186:17–19.  During the 2015 interview, Minor Victim 2 was asked about her online interactions with Taylor.  Although Minor Victim 2 discussed some of her online interactions, she did not tell the interviewer that Taylor had asked for a picture of her nude breasts.  *Id.* at 186:25–187:12.  In 2020, in preparation for Taylor's trial, Minor Victim 2 was re-interviewed by Special Agent Andrew Willmann.  During the 2020 interview, Minor

17

Victim 2 spontaneously disclosed that Taylor had requested pictures of her nude breasts prior to his arrest in 2015.  *Id.* at 187:13–19.

## II.        DISCUSSION AND CONCLUSIONS OF LAW

### A.    Facial Validity

In its mandate, the Seventh Circuit held that "[e]ven accounting for arguably false statements and misleading omissions," the Affidavit contains sufficient evidence to support a finding of probable cause to search the Residence for evidence of bestiality.  *Taylor*, 63 F.4th at 658.  However, the record did not then show whether Judge Sandifur considered the handwritten alterations before signing the Search Warrant.  The Court now finds that he did, so the Search Warrant is facially valid.

At the evidentiary hearing, Judge Sandifur testified that he specifically remembered Sergeant Getz presenting the Affidavit and Search Warrant in this case because "it was a high-profile case" and because of "the uniqueness of the fact pattern, as well as the individual involved." (Filing No. 131 at 18:1–6.)  Judge Sandifur further testified that although he did not recall seeing Sergeant Getz make the handwritten alterations to the Search Warrant, he independently recalled that the handwritten alterations were already on the Search Warrant when he signed it.  *Id.* at 21:25–26:11.  Judge Sandifur's recollections are consistent with his testimony regarding his standard practice of identifying deficiencies in search warrant submissions and allowing officers to make and initial alterations, but declining to initial those alterations himself.  The Court sees no reason to question Judge Sandifur's credibility and therefore finds his testimony to be credible.

Sergeant Getz also testified that he made all of the handwritten alterations to the Search Warrant before Judge Sandifur signed it.  Taylor argues that Sergeant Getz's testimony is not credible based on inconsistencies in his hearing testimony and his failure to turn over evidence to

federal authorities, and his misstatements and omissions in the Affidavit.  The Court will explore each argument in turn.

Taylor points to several perceived inconsistencies in Sergeant Getz's testimony to show that his credibility is "questionable at best."  (Filing No. 133 at 16.)  Taylor states that "Getz had more than 20 years of law enforcement experience at the time he sought the search warrant for Taylor's residence," yet he "claimed to be inexperienced in obtaining search warrants as an ICAC detective." *Id.*  The Court sees no inconsistency here.  While Sergeant Getz *did* have twenty years of experience with ISP before preparing the Affidavit, twelve or thirteen of those years were spent as a road trooper.  More importantly, Sergeant Getz had little experience applying for residential search warrants, no prior experience as a lead ICAC investigator, and no experience with investigations in Marion County.  Sergeant Getz therefore had almost no experience with investigations similar to his investigation of Taylor.

Taylor next argues that Sergeant Getz "initially stated he was unsure as to the nature of [his disciplinary] investigation" but "soon testified that the investigation was related to failing to make a supplemental report for his additional interview with Jane Doe." *Id.*  Again, the Court does not believe this testimony was inconsistent.  Sergeant Getz was first asked whether he had "received any reprimands for [his] failure to properly document [his] investigation."  (Filing No. 131 at 128:16–17.)  Sergeant Getz confirmed that an internal investigation was ongoing. *Id.* at 128:18, 129:5–7.  Then, when specifically asked whether the investigation was "in regards to the summer of 2023 case file that [he] rediscovered," Sergeant Getz said he was not sure because he had not yet been interviewed. *Id.* at 128:23–129:4.  Later, Sergeant Getz again stated he did not believe the investigation was related to his 2023 case file.  When asked "[w]hat specific evidence are we under investigation for mishandling," Sergeant Getz answered that the investigation related to his

19

failure to make a report of his November 2014 interview with Hamilton. *Id.* at 152:22–153:15. Sergeant Getz was consistent in testifying that he did not know whether the investigation related to his 2023 case file but did know it related to the November 2014 interview.

Taylor next cites Sergeant Getz's "troubling" withholding of evidence as a reason to doubt his credibility. The withheld evidence at issue—notes from an interview with Minor Victim 1— would have been damaging to Taylor, so Sergeant Getz's failure to turn it over to prosecutors supports his testimony that his failures arose from negligence and inexperience, not an attempt to mislead investigators. *United States v. Williams*, 718 F.3d 644, 650 (7th Cir. 2013) ("We take particular note of the officers' omission of the information" that was "clearly sufficient to establish probable cause for the warrant . . . . That omission provides a reasonable basis to believe that the police did not intend to mislead.").

The misstatements and omissions in the Affidavit, as well as Sergeant Getz's procedural missteps, are also relevant to Sergeant Getz's credibility. However, for reasons the Court will explain below, the Court concludes that these misstatements, omissions, and missteps resulted from Sergeant Getz's inattention and inexperience, not an intent to mislead. The Court therefore finds Sergeant Getz's testimony regarding the handwritten alterations to be credible.

Based on Judge Sandifur and Sergeant Getz's credible testimony, the Court concludes that the Search Warrant is facially valid. But the Court's inquiry does not end here. Taylor also argues that the search of his Residence was invalid because the Search Warrant was overbroad as to bestiality and that the *Leon* good-faith exception does not apply because Judge Sandifur was not neutral and disinterested and because Sergeant Getz acted with reckless disregard for the truth. The Court will address each argument in turn.

B.    **Overbreadth**

Taylor asserts that the search of his Residence was unconstitutional because the Search Warrant was overbroad as to bestiality.  The Search Warrant authorized law enforcement to search "essentially any and all electronic devise and hardware in Taylor's residence." (Filing No. 133 at 13.) Taylor argues that such a broad search was only authorized because it related to bestiality *and* child pornography.  He claims the Search Warrant would have been narrower had it related only to bestiality, and because only bestiality was supported by probable cause, the Search Warrant was overbroad. *Id.*   The Seventh Circuit has held that "a search warrant may be overbroad by authorizing without probable cause the seizure of all electronic devices in a location." *United States v. Vizcarra-Millan*, 15 F.4th 473, 505 (7th Cir. 2021).  However, Taylor has not shown that the Search Warrant in this case was overbroad, even as to only bestiality.

"The Fourth Amendment requires that warrants be supported by probable cause and that they describe with particularity the places and objects to be searched and seized." *Id.* at 502.  "'This particularity requirement protects persons against the government's indiscriminate rummaging through their property,' and it 'ensures that the scope of a search will be confined to evidence related to a specific crime that is supported by probable cause.'" *United States v. Miles*, 86 F.4th 734, 742 (7th Cir. 2023) (internal citations omitted) (quoting *Taylor*, 63 F.4th at 659, and *United States v. Snyder*, 71 F.4th 555, 565 (7th Cir. 2023)).  "'[P]robable cause does not require direct evidence linking a crime to a particular place,' though.  Instead, probable cause 'turn[s] on the assessment of probabilities in particular factual contexts.'" *Id.* (internal citations omitted) (quoting *United States v. Yarber*, 915 F.3d 1103, 1105 (7th Cir. 2019), and *Illinois v. Gates*, 462 U.S. 213, 232 (1983)); *see United States v. Sidwell*, 440 F.3d 865, 869 (7th Cir. 2006) ("Probable cause requires only a probability or substantial chance that evidence may be found.").

During the evidentiary hearing, counsel for Taylor asked Sergeant Getz about the scope of the Search Warrant had it related solely to bestiality:

> Q.   Okay. Would the warrant have been different if there was no child pornography involved in the case, and only bestiality?
>
> A.   I would have made the changes from child pornography to bestiality.
>
> Q.   And I appreciate that concession. My question was not inartfully asked. Would the warrant have been narrower, the things that you're searching for, if we're just searching for bestiality versus if we're searching for child pornography and bestiality?
>
> A.   If the evidence dictated that it would have only been bestiality, then, yes, the search warrant would have been --
>
> Q.   Would have --
>
> A.   -- would have been done in that manner.

(Filing No. 131 at 135:21–136:8).  Taylor argues Sergeant Getz "conce[ded] that a warrant for bestiality would have been narrower in scope than the one issued in Taylor's case, [so] the warrant fails for lack of particularity and overbreadth."  (Filing No. 133 at 13.)

The Court is not persuaded.  Sergeant Getz does not appear to have conceded that a narrower search would not have included all of Taylor's electronic devices, as Taylor contends. Sergeant Getz was only asked whether "the things that you're searching for" would have changed if the Search Warrant related only to bestiality.  He was not asked what "things" would have been excluded from the Search Warrant.  Sergeant Getz might have removed requests to search for information and items that relate solely to child pornography, like "[i]mages of child pornography and child erotica, and files containing images of child pornography and child erotica," or "[b]ooks and magazines containing visual depictions of child pornography."  (Ex. 1 at 22, attach. B at §§ (a), (d).)  In that scenario, the Search Warrant would have been narrower but still would have included requests to search for evidence of bestiality "in any form wherever it may be stored or found,

22

including hard copy or digitiai [*sic*] notes, files, data or logs." (Ex. 1 at attach. B § (a).) Moreover, Sergeant Getz's testimony indicates he would have requested authorization to search Taylor's electronic devices even if the search were limited to bestiality because, in his experience, the best evidence that someone has engaged in bestiality is images or recordings of the conduct, which are typically stored digitally ([Filing No. 131 at 165](#):4–25 ("Q. Okay. You can't call the victim as a witness, can you? A. No, sir. Q. Scruffy can't testify, he? A. No, sir.")).

Aside from citing Sergeant Getz's testimony, Taylor does not explain why there was no probable cause to search all of his electronic devices for evidence of bestiality. At the evidentiary hearing, Taylor's counsel asked questions implying that a search warrant for bestiality would have been narrower than a search warrant for child pornography because mere possession of bestiality images is not unlawful under Indiana law, unlike child pornography ([Filing No. 132](#):23–134:8). But even though possession of bestiality images is not unlawful, those images may still be evidence of bestiality. It is reasonable to infer that there is a fair probability that evidence of bestiality would be found on electronic devices. The fact that Taylor texted Hamilton a purported image of Angela engaging in bestiality supports that inference. The Court therefore concludes that the Search Warrant is not overbroad.

Moreover, assuming *arguendo* that the Search Warrant is overbroad as to bestiality, the evidence seized from Taylor's Residence may still be admissible because, for the reasons explained below, the *Leon* good-faith exception to the exclusionary rule applies. *See Vizcarra-Millan*, 15 F.4th at 506 (finding that lack of specificity did not require suppression of evidence, affirming denial of motion to suppress, and affirming conviction); *see also Matter of Use of A Cell-Site Simulator to Identify a Cellular Device in a Narcotics Trafficking Case*, 623 F. Supp. 3d 888, 897 (N.D. Ill. 2022) ("[E]ven if particularity and overbreadth challenges to a warrant appear successful

at first blush, it is often the case that the government's good faith reliance on a facially valid warrant results in upholding the searches and the inapplicability of the exclusionary rule.").

## C. *Leon* **Good-Faith Exception**

In *United States v. Leon*, 468 U.S. 897 (1984), the United States Supreme Court held that evidence from a search conducted based on an invalid warrant may still be admitted if law enforcement relied upon the warrant in good faith. *Yarber*, 915 F.3d at 1106. Courts presume that an officer with a warrant was acting in good faith, and the defendant bears the burden to rebut that presumption. *United States v. Matthews*, 12 F.4th 648, 653 (7th Cir. 2021). The defendant may rebut the presumption by showing that:

> (1) the affiant misled the magistrate judge with information the affiant knew was false or would have known was false but for the affiant's reckless disregard for the truth; (2) the magistrate wholly abandoned the judicial role and instead acted as an adjunct law-enforcement officer; (3) the affidavit was so bare boned, "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) the warrant was so facially deficient in particularizing its scope that the officers could not reasonably presume it valid.

*Id.* (quoting *United States v. Rees*, 957 F.3d 761, 771 (7th Cir. 2020)). Taylor argues that the first and second circumstances apply here. The Court will address them in reverse order, discussing whether Judge Sandifur acted as a neutral and disinterested magistrate before wrestling with whether Sergeant Getz acted with reckless disregard for the truth.

### 1. **Neutral and Disinterested Magistrate**

The Fourth Amendment requires that law enforcement obtain search warrants from "neutral and detached" magistrates. *Franks*, 438 U.S. at 164.

> The magistrate "must determine independently whether there is probable cause," *id.* at 165, 98 S.Ct. 2674, for it is "the magistrate's scrutiny," and no one else's, that "is intended to eliminate altogether searches not based on probable cause." *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Individual security against Fourth Amendment violations would otherwise be left "only in the discretion of the police." *Katz*, 389 U.S. at 358–59, 88 S.Ct. 507, quoting *Beck v. Ohio*, 379 U.S. 89, 97, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

24

*Taylor*, 63 F.4th at 648.  The neutral magistrate requirement was reiterated in *Leon*, where the Supreme Court stated that the good-faith exception to the exclusionary rule "will not apply in cases where the issuing magistrate wholly abandoned his judicial role . . . ; in such circumstances, no reasonably well trained officer should rely on the warrant."  *Leon*, 468 U.S. at 923.

Taylor argues that Judge Sandifur was not acting as a neutral or disinterested magistrate because he told Sergeant Getz "what information to include on the warrant in order for Judge Sandifur to find 'probable cause'" (Filing No. 133 at 13–14).  The evidence does not support this contention.  Although Sergeant Getz testified that Judge Sandifur told him to add the handwritten alterations "[b]ecause of the discrepancy," Judge Sandifur's testimony explained in more detail how the conversation unfolded, consistent with his standard practice:

> I would have said, 'If there is something that you want that is not contained within the order, that you need to put it on that order.' So to the extent that that would be directing that to be done, the answer would be yes. To the extent that that's his choice, whether or not he wants to come back with a new submission, that would be up to him. But I did say if it's something he wanted, it needs to be on there.

(Filing No. 131 at 22:21–23:2.)  This testimony shows that Judge Sandifur merely noticed potential omissions from the Search Warrant and told Sergeant Getz that *if Sergeant Getz* wanted that information included in the Search Warrant, then *Sergeant Getz* would need to add that information and resubmit the Search Warrant.  Judge Sandifur did not direct Sergeant Getz to make any particular alterations.  Ironically, Judge Sandifur did not initial handwritten alterations because he believed they were the officers' statements, not the court's.  *Id.* at 11:1–7.

Other courts have held that magistrates did not abandon their neutral roles by suggesting that affiants make revisions to search warrant applications.  *United States v. Frazier*, 423 F.3d 526, 538 (6th Cir. 2005) ("After Agent Stewart resubmitted the affidavit . . . the magistrate reviewed it and returned it with instructions to 'strengthen' paragraph 17 . . . . [T]he magistrate also asked him to add what became of paragraph 18 . . . . This evidence demonstrates that the magistrate not only

reviewed the affidavit, but did so with a critical eye."); *United States v. Loy*, 569 F. Supp. 2d 601, 614 (N.D.W.V. 2008) (concluding that magistrate's suggestion that detective attach statement or amend contents of attachment "does not indicate the Magistrate breached his duty as a neutral and detached magistrate," and citing several cases holding the same).  The Court is persuaded by those cases here.  The fact that Judge Sandifur carefully reviewed the Affidavit and Search Warrant (as was his duty), notified Sergeant Getz about specific inconsistencies between those documents, and gave him an opportunity to correct those inconsistencies does not show that Judge Sandifur abandoned his role as a neutral and detached magistrate.

There was also no testimony that the handwritten alterations were added so that Judge Sandifur could find probable cause.  The handwritten alterations only served to broaden the scope of the Search Warrant; they did not provide additional evidence that might have supported probable cause.  Judge Sandifur even stated that without the handwritten alterations, he still would have found probable cause to search for evidence of child pornography.  *Id.* at 20:15:20.[4]  Taylor has not shown that Judge Sandifur abandoned his role as a neutral and disinterested magistrate when reviewing the Affidavit and Search Warrant.

## 2.    <u>Reckless Disregard</u>

It is beyond dispute that Sergeant Getz's investigation suffered from several errors and missteps.  Sergeant Getz failed to inquire as to certain pertinent information, including Hamilton's relationship with Trooper Etter and/or Santa, and the reason why Hamilton reported her concerns directly to Trooper Etter.  Sergeant Getz mischaracterized how Hamilton first notified Trooper

---

[4] Taylor describes this statement by Judge Sandifur as "troubling" because it conflicts with the Seventh Circuit's conclusion that the Affidavit did not establish probable cause to search for evidence of child pornography. (Filing No. 133 at 14.) The fact that Judge Sandifur disagrees with the Seventh Circuit's probable cause determination does not show that he was not neutral or disinterested. Judges regularly reach reasonable but differing conclusions as to the same issues; even Supreme Court Justices dissent from the others' opinions on occasion.

Etter of her concerns, and he omitted from the Affidavit several relevant facts, including Hamilton's true name; that Hamilton was interviewed in November 2014; that Hamilton had a sexual relationship with Taylor and Angela; that Hamilton was scheduled to meet Taylor and Angela the same night as the October 2014 interview; that Hamilton had not been to the Residence; any information about Santa; that Taylor had never sent Hamilton child pornography images or previously mentioned child pornography; that Hamilton had ordered prescription drugs; and certain subscriber information for Taylor's cell phone. Sergeant Getz also made several procedural errors, including: failing to make a supplemental report of Hamilton's second interview; deleting emails from AT&T; taking five months to return the Search Warrant; and withholding victim interview notes until 2023. The Government attributes these errors to sloppy police work, as does Sergeant Getz. Taylor contends that based on the number of errors, Sergeant Getz acted with reckless disregard for the truth. The pertinent question, then, is whether Sergeant Getz's conduct rises to the level of reckless disregard, which would warrant suppression. The Court concludes it does not.

In its decision in this case, the Seventh Circuit emphasized the importance of truthful and complete information in protecting citizens' Fourth Amendment rights:

> A magistrate's decision depends on the facts submitted in the warrant application. That factual showing must be both truthful and complete. *Franks*, 438 U.S. at 164–65, 98 S.Ct. 2674 (truthful); *United States v. McMurtrey*, 704 F.3d 502, 513 (7th Cir. 2013) (complete). To be sure, truthfulness does not require that "every fact recited in the warrant affidavit is necessarily correct," *Franks*, 438 U.S. at 165, 98 S.Ct. 2674, nor does completeness require law enforcement to "provide every detail of an investigation." *McMurtrey*, 704 F.3d at 513. But truthfulness does require that the information in the affidavit be "believed or appropriately accepted by the affiant as true." *Franks*, 438 U.S. at 165, 98 S.Ct. 2674. Law enforcement also may not "deliberately omit information the magistrate needs to assess fairly the issue of probable cause." *McMurtrey*, 704 F.3d at 513.

*Taylor*, 63 F.4th at 648. "Suppression therefore remains an appropriate remedy if the magistrate judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false

27

or would have known was false except for his reckless disregard of the truth." *Leon*, 468 U.S. at 923, 926 ("In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit . . . .").

In deciding whether Sergeant Getz acted with "reckless disregard," the Court is mindful of the purpose of the exclusionary rule, the purpose of the good-faith exception to that rule, and the reason why "reckless" conduct falls outside the good-faith exception. "Suppression of evidence is a 'last resort.' It is not a personal constitutional right, nor is it intended to remedy the injury of having one's rights violated. Instead, it is a judge-made rule meant to deter future Fourth Amendment violations." *United States v. Kienast*, 907 F.3d 522, 527 (7th Cir. 2018) (internal citations omitted) (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)) (citing *Davis v. United States*, 564 U.S. 229, 236–37 (2011)). In *Leon*, the United States Supreme Court explained that the deterrent value of the exclusionary rule must be balanced against "[t]he substantial social costs exacted by the exclusionary rule," including impediments to the truth-finding functions of judges and juries and the risk that guilty defendants may go free or received favorable plea agreements. *Leon*, 468 at 906–08; *see Herring v. United States*, 555 U.S. 135, 414 (2009). Accordingly, application of the exclusionary rule is "strictly limited" to "cases in which its deterrent effect on police conduct will outweigh its 'heavy costs,'" like cases involving "'deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights' on the part of the police." *Kienast*, 907 F.3d at 527 (quoting *Davis*, 564 U.S. at 237–28). The Supreme Court has "'never suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence.'" *Herring*, 555 U.S. at 141 (quoting *Pennsylvania Bd. of Probation & Parole v. Scott*, 524 U.S. 357, 363 (1998)).

"An affiant acts with reckless disregard for the truth when he 'in fact entertain[s] serious doubts as to the truth of his allegations.'"  This is "a subjective inquiry that focuses on the officer's state of mind.  A showing of reckless disregard requires more than a showing of negligence and may be proved from circumstances showing obvious reasons for the affiant to doubt the truth of the allegations." *Williams*, 718 F.3d at 650 (internal citations omitted) (quoting *United States v. Lowe*, 516 F.3d 580, 584 (7th Cir. 2008), quoting *United States v. A Residence Located at 218 Third Street*, 805 F.2d 256, 258 (7th Cir. 1986)).  With respect to omissions, "[t]he defendant 'must offer direct evidence of the affiant's state of mind or inferential evidence that the affiant had obvious reasons for omitting facts in order to prove deliberate falsehood or reckless disregard.'" *United States v. Souffront*, 338 F.3d 809, 822 (7th Cir. 2003) (quoting *United States v. McNeese*, 901 F.2d 585, 594 (7th Cir. 1990)).

In *Herring v. United States*, the Supreme Court found that suppression was not appropriate even though law enforcement had arrested the defendant based on a recalled warrant.  In *Herring*, the defendant was arrested based on a warrant from a neighboring county.  555 U.S. at 137.  A search incident to that arrest yielded drugs and a gun.  It was later revealed that the warrant had been recalled several months earlier.  The recall was not entered into law enforcement's database due to law enforcement's failure to update its records.  *Id.* at 138.  The court stated that although recordkeeping errors by police are not always immune from the exclusionary rule, the failure to update the records in *Herring* did not rise to the level of "deliberate, reckless, or grossly negligent conduct" or "recurring or systemic negligence" that would warrant suppression.  *Id.* at 703.

The Seventh Circuit also declined to apply the exclusionary rule in *United States v. Williams*, despite law enforcement's numerous errors in drafting a search warrant affidavit.  718 F.3d at 650.  Following a *Franks* hearing, "[t]he district court concluded that the affidavit contained

mistakes but found it 'difficult to conceive of [the mistakes] in circumstances as representing actual reckless disregard of the truth.'" *Id.* at 639.  "The police were assembling a warrant application during a rapidly developing investigation that had to be completed quickly that afternoon. . . . While there was a good deal of haste, sloppiness, and error in the drafting process, the court found that any errors did not reflect reckless indifference to the truth." *Id.*  The Seventh Circuit found that the district court's conclusion was not clearly erroneous, stating: "[w]hile we are troubled by the officers' errors, the record does not compel the conclusion that the officers acted with deliberate or reckless disregard for the truth. The police were rushing to draft an application for the warrant and hastily omitted both favorable and unfavorable evidence from the affidavit." *Id.* at 650.

In *Mapp v. Ohio*, 367 U.S. 643 (1961), by contrast, the Supreme Court applied the exclusionary rule where law enforcement forced open the door to the defendant's house, kept her lawyer from entering, brandished a false warrant, and forced the defendant into handcuffs and canvassed her house for obscenity.  *Id.* at 644–45.  And in *Taylor v. Hughes*, 26 F.4th 419 (7th Cir. 2022), the Seventh Circuit concluded that the officer applying for a search warranted acted with reckless disregard for the truth when he failed to confirm which of four apartments was the subject premises and then simply guessed which one it was in the warrant.  *Id.* at 423–24 428–30.

Sergeant Getz admittedly made many more mistakes than the officers in *Herring* and was not under the same time pressure as the officers in *Williams*.  Yet Sergeant Getz's conduct does not rise to the level of reckless disregard found in *Mapp* or *Hughes* for several reasons.  First, the evidence shows that Sergeant Getz was inexperienced in investigations similar to the one in *Taylor*. Second, the fact that Sergeant Getz omitted favorable *and* unfavorable information from the Affidavit shows that he did not omit information to mislead the magistrate.  For example, Sergeant Getz did not state that he interviewed Hamilton in November 2014, but he also did not state that

Hamilton had seen Angela's breasts on at least ten other occasions and knew that Angela wore white lingerie, which would have supported Hamilton's identification of Angela as the woman in the bestiality image. Sergeant Getz also omitted the results of his April 29, 2015 surveillance, but the fact that Sergeant Getz saw Taylor's vehicle at the Residence that day would have supported his request to search the Residence. And although Sergeant Getz omitted the name of the "financially liable party" and "user" of Taylor's cell phone, he also omitted the "contact e-mail address" for the phone, which would have tied the phone to Taylor. What is more, several of Sergeant Getz's errors were purely typographical errors, like his repetition of paragraph "12", which is consistent with Sergeant Getz's testimony that his mistakes resulted from simple inattention.

Third, the low probative value of the information omitted shows that Sergeant Getz did not omit that information to mislead the magistrate. Sergeant Getz testified throughout the evidentiary hearing that the focus of his investigation was the text messages from Taylor, and Judge Sandifur and the Seventh Circuit agreed that those messages alone give rise to probable cause. (Filing No. 131 at 13:20–14:3); *Taylor*, 63 F.4th at 658. The information that Taylor either misstated or omitted from the Affidavit, while relevant, would not have affected the probative value of the text messages. Hamilton's name or details of her "love quadrangle," for example, might speak to her credibility but would not affect the existence and substance of the text messages. As such, there is no "obvious" reason why Sergeant Getz would have misstated or omitted this information. *See United States v. Billian*, 600 F.3d 791, 794–95 (7th Cir. 2010) (finding district judge did not commit clear error in concluding that officers did not act with reckless disregard even though officers failed to corroborate tipster's information in certain ways, because corroborating information would have been immaterial to probable cause determination).

31

For all of these reasons, the Court concludes that Sergeant Getz did not intend to mislead the magistrate, and that his mistakes do not rise to the level of reckless disregard for the truth. That said, the Court does not suggest that these types of errors can never rise to the level of reckless disregard, especially when made by a law enforcement officer with as many years of experience as Sergeant Getz. The Fourth Amendment will not excuse an unlimited number of mistakes, no matter how innocent. Nevertheless, based on the unique facts and circumstances of this case, Sergeant Getz's missteps do not warrant application of the exclusionary rule. Sergeant Getz did not flagrantly abuse the Fourth Amendment, and the Court finds that applying the exclusionary rule here would have very little value in deterring future misconduct by law enforcement.

### D.   <u>Inevitable Discovery</u>

In its supplemental response to Taylor's Motion to Suppress and at the evidentiary hearing, the Government argued that even if the Search Warrant were invalid, the evidence seized from the Residence is still admissible under the doctrine of inevitable discovery. Taylor disputes whether the Government may raise the inevitable discovery doctrine and whether it applies here. Because suppression is unwarranted for the reasons discussed above, the Court need not decide whether the Government may raise the inevitable discovery doctrine or whether it applies here.

### III.   <u>CONCLUSION</u>

For the reasons explained above, the Court **DENIES** Taylor's Motion to Suppress (Filing No. 62). Pursuant to the Seventh Circuit Court of Appeals' April 17, 2023 mandate, the judgment against Defendant Russell Taylor was vacated. (*See* Filing No. 109; Filing No. 110). Having determined that the issuing judge approved the alterations to the warrant prior to its execution and that the *Leon* good-faith exception to the exclusionary rule applies, the Court sets this matter for a final pretrial conference on October 24, 2024 at 1:00 p.m., Room 344, and trial by jury on

November 18, 2024 at 9:00 a.m. in in Room 344, Birch Bayh Federal Building and United States

Courthouse, Indianapolis, Indiana.

**SO ORDERED**.

Date:   9/4/2024

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Jeremy Brian Gordon
GUEST AND GRAY
jeremy@guestandgray.com

Zachary Lee Newland
NEWLAND LEGAL PLLC
zach@newlandlegal.com

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
kathryn.olivier@usdoj.gov

Bradley Paul Shepard
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
brad.shepard@usdoj.gov